**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 16-185-DLB-CJS**

**ROBERT L. MOORE**                                                              **PLAINTIFF**


**VS.**                          **MEMORANDUM OPINION AND ORDER**


**MASON COUNTY, KENTUCKY, et al.**                                **DEFENDANTS**

* * * * * * * * * * * * * *

This matter is before the Court upon Defendants Mason County and Mason County Detention Center's Motion for Summary Judgment, seeking judgment as a matter of law on Plaintiff Robert L. Moore's employment-discrimination claims under the Rehabilitation Act of 1973 and the Kentucky Civil Rights Act ("KCRA"). In their Motion, Mason County (the "County") and the Mason County Detention Center (the "Detention Center") argue that Moore has not sued the proper parties and has failed to create a genuine issue of material fact regarding whether the Defendants violated the Rehabilitation Act or the KCRA. The Court has federal-question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

In approximately 1992 or 1993, Plaintiff Robert Moore began working at the Mason County Detention Center as a deputy jailer. (Doc. # 38-15 at 13:15-20). At some point in 1997, Moore's employment with the Detention Center was terminated because of his allegedly insufficient supervision of juvenile detainees. *Id.* at 14:11-18. Roughly three

years later—in 2000—Moore was rehired and resumed working as a deputy jailer at the Detention Center. *Id.* at 16:2-12. Moore's second stint at the Detention Center lasted approximately fifteen years, until his termination in October of 2015. *Id.* at 20:19-23.

In Kentucky, the Jailer—a constitutionally elected county official—has "custody, rule and charge of the jail" or detention center in his or her county and "of all persons in the jail." Ky. Const. § 99; Ky. Rev. Stat. Ann. § 71.020. Over the approximately twenty-two years Moore was employed at the Detention Center, he served under several different Jailers. *Id.* at 17:9-18:5. The last Jailer that Moore worked for—Lisa O'Hearn—was elected in November of 2014 and took office in January of 2015. (Doc. # 38-17 at 11:10-17).

When Jailer O'Hearn assumed office, Moore's duties as a deputy jailer revolved around the recycling center. (Doc. # 38-15 at 29:1-32:4). Specifically, Moore was responsible for transporting inmates to the recycling center and supervising them as they sorted through recycled waste products. *Id.* When serving in his recycling-center role, Moore estimates that he was in the Detention Center for only forty-five minutes per day. *Id.* at 35:25-36:1. A few months into her term, Jailer O'Hearn determined that it was unnecessary for a deputy jailer to transport and supervise inmates at the recycling center because the recycling center's staff had been trained through the Department of Corrections. (Docs. # 38-17 at 38:20-25; 38-15 at 37:4-38:21). After Moore's recycling-center position was eliminated, Moore's duties shifted back to the Detention Center and, at least for a short time, Moore performed the typical duties of a deputy jailer, including assisting with the booking process and operating the control room. (Doc. # 38-15 at 41:11-23).

The parties' primary dispute involves the Detention Center's control room. On one issue, however, the parties agree—the control room is a central and critical part of the Detention Center. (Docs. # 38-15 at 42:21; 38-16 at 26:13-18; 38-17 at 25:16-21; 38-18 at 31:15-32:6) (describing the control room as the "heartbeat of the jail," "the nerve center of the jail," "the brain of the facility," and "the heart of the jail."). The control-room operator answers the phone, observes the happenings in the Detention Center, relays important information to the deputies on the floor, assists deputies in moving throughout the facility, and ensures deputies' and inmates' safety if there is a disturbance. (Docs. # 38-15 at 42:14-16; 38-16 at 26:13-27:11). And in the case of an evacuation or emergency, the control-room operator is the last person to exit the Detention Center. (Docs. # 38-15 at 46:16-20; 38-17 at 33:16-21).

Historically, the control-room operator was a rotating position throughout each shift. (Doc. # 38-16 at 27:12-28:10). Because the Detention Center was staffed on a "platoon" system, one sergeant and several deputy jailers were scheduled for each twelve-hour shift. *Id.* at 37:3-9. In turn, the shift sergeant assigned each deputy jailer to their particular post—booking officer, floor officer, control-room operator, or relief rover— and typically, the deputies would rotate among those positions during the course of their twelve-hour shift. *Id.* at 37:10-21. Therefore, individual deputies were not scheduled for a specific shift or assigned to a particular position; instead, deputy jailers' shifts were dictated by their platoon, their position assignments were determined by their sergeant, and their responsibilities rotated throughout their shift. *Id.*

In theory, every deputy jailer "would take a turn in the control room" during each twelve-hour shift. (Doc. # 38-17 at 31:12-25). In practice, however, the rotating nature

of the control-room-operator position varied slightly. The record evidence establishes that before Jailer O'Hearn assumed office, her predecessor had permitted Daniel Brent, an elderly deputy jailer referred to as "Pops," to work exclusively in the control room for a "couple of years." (Doc. # 38-16 at 31:20-32:8). But, by the time Jailer O'Hearn took over the Detention Center, the rotation of the control-room-operator position had recommenced and Jailer O'Hearn had made cross-training deputies on the various positions one of her top priorities. *Id.* at 32:14-33:1, 72:9-73:1.

After his recycling-center position was eliminated, Moore claims that he overheard Jailer O'Hearn and Chief Deputy Muse discussing Moore's situation and the possibility of assigning him to Pops's prior position. (Doc. # 38-15 at 39:18-40:2). Apparently, Moore's "legs" were "bad" and there was doubt as to his ability to rotate among the various responsibilities of a deputy jailer. *Id.* Shortly thereafter, Moore alleges that he was "appointed" control-room operator and that he worked in the control room exclusively for approximately six months. *Id.* at 21:4-8, 39:18-40:25.

The Defendants challenge Moore's characterization of his duties as a deputy jailer and contend that the control-room operator is not a distinct position. (Doc. # 32-1 at 2). Specifically, Jailer O'Hearn testified in her deposition that she found it "hard to believe" that Moore was scheduled to work exclusively in the control room because she remembered Moore performing other tasks—supervising inmates shovel snow, for example—but conceded that it was "possible." (Doc. # 38-17 at 40:2-25). Stephanie Wood, who served as one of Jailer O'Hearn's chief deputies, testified that she did not recall the control-room position being assigned to any particular person during her time at the Detention Center. (Doc. # 38-18 at 32:10-16). Jerry Muse, who also served as

one of Jailer O'Hearn's chief deputies for several months, testified that the control-room position was a "rotating" position, but also indicated that Moore worked in the control room exclusively, at least for some period of time.[1]  (Doc. # 38-16 at 32:14-33:1; 33:23-34:1; 39:8-40:15).

Although it is unclear whether Moore worked exclusively as the control-room operator, and if so, how long, it is clear that Moore last worked at the Detention Center in late July of 2015.  On July 20, 2015, Moore requested leave under the Family and Medical Leave Act ("FMLA") after sustaining a back injury outside of work.  (Docs. # 38-12; 38-15 at 49:1-5).  Moore's FMLA leave commenced on July 31, 2015, and he was scheduled to return on October 22, 2015.  (Doc. # 38-1).  During the course of his treatment for his back injury, Moore was diagnosed with arthritis on his left side and informed that he would need to undergo hip-replacement surgery.[2]  (Doc. # 38-15 at 51:19-54:14).

As his FMLA leave came to an end, Moore obtained a "return-to-work" note from his doctor, that included several physical limitations.  *Id.* at 60:4-14.  Although Moore believed that none of his physical limitations prevented him from working in the control room exclusively, Jailer O'Hearn indicated that Moore's physical limitations rendered him unable to perform the duties of a deputy jailer.  *Id.* at 60:16-61:15.  After their conversation, Jailer O'Hearn provided Moore with a "Fit for Duty" form.  (Docs. # 38-2; 38-15 at 61:16-62:5).  Moore then filled out the form, indicating what he could and could not do, had his doctor sign off on the form, and returned the form to Jailer O'Hearn.  (Doc.

---

[1]     The record evidence is also unclear as to how often Moore was working.  In addition to a doctor's note requesting that Moore's absence from work be excused from July 13, 2015 through July 23, 2015 (Doc. # 38-11), there is also deposition testimony indicating that Moore "missed a significant amount of work" before Moore took FMLA leave.  (Doc. # 38-17 at 43:10-17).

[2]     At the time of his deposition, Moore had not yet undergone hip-replacement surgery because Moore's doctor has suggested that he lose weight before having surgery.  (Doc. # 38-15 at 51:19-52:4).

# 38-15 at 61:16-65:6).  On the form, Moore indicated that he was capable of "physically respond[ing] to an emergency situation" and "evacuat[ing] inmates from the building," but was unable to "bend over," "lift persons/inmates," "run," "walk swiftly," "physically disrupt fights," "go hands on with others," "physically restrain inmates," and "engage in forced movements of inmates."  (Doc. # 38-2).  Although Moore argues that the Detention Center formulated the "Fit for Duty" form with his specific limitations in mind and did not require other deputy jailers to confirm that they were fit for duty (Doc. # 38 at 14-15), the Defendants assert that each of the physical requirements listed on the form are necessary to perform the typical duties of a deputy jailer, rotating into each position.[3]  (Doc. # 38-17 at 51:19-57:14).

Upon reviewing Moore's "Fit for Duty" form, Jailer O'Hearn informed Moore that there were no positions at the Detention Center that he could perform with his physical limitations.  (Doc. # 38-15 at 65:11-66:2).  Moore requested to work in the control room exclusively, but Jailer O'Hearn denied that request because the control-room-operator position was a "rotating position," rather than "an isolated position."  (Doc. # 38-17 at 57:18-24, 68:5-69:2).  During their conversation, Moore also disclosed his need for a cane to ambulate, but Jailer O'Hearn refused to permit Moore to use a cane while working at the Detention Center because of safety concerns for Moore, other deputy jailers, and inmates.[4]  (Docs. # 38-15 at 66:3-14; 38-17 at 57:15-17, 74:5-9).  On October 23, 2015,

---

[3]     With respect to physical fitness, 501 Ky. Admin. Reg. § 3:040(5) requires that the Jailer or jail administrator "ensure a level of physical fitness is maintained that will allow each employee to satisfactorily perform his or her duties."

[4]     Even if Moore had been permitted to work exclusively in the control room, he would have required the use of a cane to ambulate to and from the Detention Center's control room.  (Doc. # 1 at ¶ 52).  In his deposition, Moore testified that a pretrial officer, Darlene Garrett, who is not employed by the Detention Center but works with inmates in the Detention Center, required the use of an assistive device—either a cane or crutches—to ambulate because she had broken her foot.  (Doc. # 38-15 at 71:5-72:22).  Jailer

after Jailer O'Hearn concluded that Moore's physical limitations prevented him from returning to work as a deputy jailer at the Detention Center, Moore was terminated. (Doc. # 38-17 at 73:4-9).

On October 20, 2016, Moore filed the instant action against Mason County and the Mason County Detention Center, alleging violations of the Rehabilitation Act and the KCRA. (Doc. # 1). Specifically, Moore contends that he should have been permitted to work exclusively in the control room and claims that he was capable of performing the control-room operator's functions with the assistance of a cane to ambulate. *Id.* at ¶¶ 32-33, 37. Because the Defendants allegedly failed to make—or attempt to make—reasonable accommodations for him, Moore claims that the Defendants violated the Rehabilitation Act and the KCRA by requiring him to meet physical fitness standards and terminating his employment because of his inability to meet those standards. *Id.* at ¶¶ 40-42, 59-61.

After the parties completed discovery, the Defendants filed the instant Motion for Summary Judgment, arguing that Moore has not sued the proper parties and has failed to create a genuine issue of material fact regarding whether the Defendants violated the Rehabilitation Act or the KCRA. (Doc. # 32). Moore having filed his Response in opposition (Doc. # 38), and the Defendants having filed their Reply (Doc. # 39), the Motion for Summary Judgment is fully briefed and ripe for review. For the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. # 32) is **granted**.

---

O'Hearn testified that upon learning that Ms. Garrett required the use of crutches, she prohibited her from entering the Detention Center until she no longer needed crutches. (Doc. # 38-17 at 48:5-49:20).

## II.     ANALYSIS

### A.     Standard of Review

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "there is sufficient evidence … for a jury to return a verdict for" the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  Once a party files a properly supported motion for summary judgment, by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient."  *Id.* at 252.

In ruling on the motion, the Court must "accept Plaintiff's evidence as true and draw all reasonable inferences in [his] favor."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255).  The Court is not permitted to "make credibility determinations" or "weigh the evidence when determining whether an issue of fact remains for trial."  *Id.* (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001)).  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52).  If there is a dispute over facts that might affect the

outcome of the case under governing law, the entry of summary judgment is precluded. *Anderson*, 477 U.S. at 248.

As the moving parties, the County and the Detention Center must shoulder the burden of showing the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming the County and the Detention Center satisfy their burden, Moore "must—by deposition, answers to interrogatories, affidavits, and admissions on file— show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

### B.    Proper Parties

In their Motion for Summary Judgment, Defendants claim that the Detention Center is not a legal entity capable of being sued and argue that Moore's claims against the Detention Center must be dismissed. (Doc. # 32-1 at 6). In response, Moore "concedes, that, to the extent that [the Detention Center] is nothing more than an instrumentality of the County, and the County provides staffing, funding, and control" for the Detention Center, "then it is indeed the County who is the most appropriate [d]efendant."[5] (Doc. # 38 at 4). The Court agrees.

Federal Rule of Civil Procedure 17(b) provides that "[c]apacity to sue or be sued" for parties other than individuals and corporations is determined "by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3). Because Kentucky law characterizes

---

[5]      After making this concession, Moore argues in a footnote that "to the extent that [the Detention Center] is found *not* to be operated by the County and the County's officers and agents, Plaintiff would argue that [the Detention Center] is in fact an appropriate defendant." (Doc. # 38 at 4 n.18). Despite Moore's attempt to hedge his bets on this concession, he has not developed any facts or put forth any legal argument that would support the contention that Mason County is not the governmental entity responsible for the Mason County Detention Center.

a county detention center as merely "an alter ego of the county," *Bryant v. Pulaski Cty. Det. Ctr.*, 330 S.W.3d 461, 465 (Ky. 2011), courts applying Kentucky law have repeatedly dismissed various state and local departments, such as police departments, sheriff's departments, and detention centers on the basis that they are not capable of being sued. *See Smith v. Franklin Cty.*, 227 F. Supp. 2d 667, 674-75 (E.D. Ky. 2002); *Fultz v. Whittaker*, 187 F. Supp. 2d 695, 708 (W.D. Ky. 2001); *Tidaback v. City of Georgetown*, No. 5:15-cv-226-JMH, 2017 WL 1398333, at *3 (E.D. Ky. Apr. 14, 2014). Therefore, Moore's claims against the Detention Center are dismissed because the Detention Center is not a proper defendant.

The Defendants also argue that the County is not a proper defendant in this matter because Kentucky law places the responsibility for "the appointment and removal of jail personnel" with the elected Jailer in each county. (Doc. # 32-1 at 6 (citing Ky. Rev. Stat. Ann. §§ 71.020, 71.060). For that reason, the Defendants claim that the County "has no jurisdiction to rectify or interfere with the decision[s] of the elected jailer" and therefore, cannot be held liable for those decisions. *Id.* at 7-8. In this respect, the Defendants are mistaken.

Kentucky law provides that county jailers "shall be responsible for the appointment and removal of jail personnel" and authorizes jailers to "dismiss … deputies at any time with cause." Ky. Rev. Stat. Ann. § 71.060(2). An elected county official's plenary power of appointment and removal of subordinates, however, does not prevent such a subordinate from being a county employee. *See Lococo v. Barger*, 958 F. Supp. 290, 294 (E.D. Ky. 1997) (considering an employment-discrimination claim under the KCRA based on the county attorney's firing of an assistant county attorney and holding that even

if Perry County "did not have any say in the hiring" or firing, the county attorney "would be considered an agent of the county and the county would be considered an employer under" the KCRA), *reversed on other grounds by Lococo v. Barger*, 234 F.3d 1268 (6th Cir. 2000) (table).

Although Kentucky courts have not specifically held that a county is liable for the elected county jailer's employment decisions, a review of the legal landscape suggests that Kentucky courts would answer that question in the affirmative. In cases where a deputy jailer has challenged the decision to terminate him and the process for doing so, courts have considered counties' liability for county jailers' employment decisions without any indication of doubt regarding the propriety of the counties' status as defendants. *See, e.g.*, *Martin v. Osborne*, 239 S.W.3d 90 (Ky. Ct. App. 2007); *Said v. Lackey*, 731 S.W.2d 7 (Ky. Ct. App. 1987); *Fields v. Benningfield*, 544 F. App'x 626 (6th Cir. 2013). In addition, opinions from the Kentucky Attorney General have also characterized jail employees as "county employees." Ky. OAG 82-423; 96-42.

Common sense also suggests that the County is a proper defendant in an action challenging the County Jailer's employment decision because a suit against the County Jailer, in his or her official capacity, is tantamount to a suit against the County. *Yates v. Benningfield*, No., 2012-CA-154-MR, 2013 WL 781098, at *2 (Ky. Ct. App. Mar. 1, 2013) ("As to Benningfield and Rogers in their respective official capacities, the jailer and judge executive are elected officers of the county and claims against a jailer and judge executive in their official capacities are essentially claims against the county."); *Commonwealth v. Harris*, 59 S.W.3d 896 (Ky. 2001); *Suiter v. Logan Cty. Reg'l Det. Ctr.*, No. 2011-CA-614-MR, 2013 WL 780390 (Ky. Ct. App. Mar. 1, 2013). Therefore, had Moore sued the Mason

County Jailer, Lisa O'Hearn, in her official capacity—as the Defendants argue Moore should have done—the Court would have construed those claims as claims against Mason County.[6] (Doc. # 32-1 at 8). Accordingly, Mason County is a proper defendant in this matter and the Court must now turn to the merits of Moore's claims.

## C. Legal Framework

The Rehabilitation Act "specifies that 'the standards used to determine whether [the Act] has been violated in a complaint alleging employment discrimination … shall be the standards applied under" the Americans with Disabilities Act of 1990 ("ADA"). *Lee v. City of Columbus*, 636 F.3d 245, 250 (6th Cir. 2011) (quoting 29 U.S.C. § 794(d)). Thus, in the Sixth Circuit, "claims under the Rehabilitation Act substantively mirror those brought under the [ADA]."[7] *Roetter v. Mich. Dep't of Corr.*, 456 F. App'x 566 (6th Cir. 2012); *see also Doe v. Salvation Army in the U.S.*, 531 F.3d 355, 357 (6th Cir. 2008). In turn, the

---

[6]     The cases that the Defendants cite do not lend support to their contention that the County is not a proper defendant in this matter. In *Cooper v. Bryant*, No. 0:04-cv-32-HRW, 2006 WL 753200 (E.D. Ky. Mar. 23, 2006), the court considered patronage dismissals and determined that neither the County Judge-Executive nor the individual Magistrates on the County Fiscal Court were involved "in the decisions of hiring, firing, or retaining jail employees" and the court was unable to "divine" a "set of facts or circumstances which would entitle the Plaintiff to relief against [those] Defendants." *Id.* at *6. However, one of the claims that survived summary judgment was a claim against the County Jailer in his official capacity, *id.*, and such a claim is equivalent to a claim against the County. Therefore, any reliance on *Cooper* is misplaced.
        Similarly, the facts of *Hagan v. Anderson Cty. Fiscal Court*, 105 F. Supp. 2d 612 (E.D. Ky. 2000) render that case inapposite. In *Hagan*, the court determined that the County Judge-Executive and Fiscal Court were without authority to require the medical director of the Anderson County Emergency Medical Service to permit the plaintiff-employee to work as a paramedic. *Id.* at 615. That determination, however, did not lead the court to conclude that the County was an improper party in the action. Rather, the court held that the plaintiff's employment-discrimination claim under the Americans with Disabilities Act could not survive summary judgment because he was not "otherwise qualified" for his position, in the absence of the medical director's approval. *Id.* at 615-18.

[7]     That said, there are important differences between the Rehabilitation Act and the ADA. "The ADA and the Rehabilitation Act both prohibit discrimination against the disabled—but the Rehabilitation Act, unlike the ADA, expressly prohibits discrimination *solely* on the basis of disability." *Lee*, 636 F.3d at 250. "The ADA, on the other hand, proscribes discrimination 'on the basis of disability,'" and thus establishes a more stringent standard. *Id.* at 250 n.4. Under the Rehabilitation Act, then, an employer may "make a decision *because* of a handicap if the handicap is not the sole reason for the decision." *Burns v. City of Columbus, Dep't of Pub. Safety*, 91 F.3d 836, 841-42 (6th Cir. 1996).

language of the KCRA "mirrors that of the ADA." *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007); *see also Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003).  Accordingly, Moore's claims under the Rehabilitation Act and the KCRA will be addressed concurrently and analyzed "consistently with the standards developed under the ADA." *Id.*

### D.    The Merits of Moore's Claims

"The Rehabilitation Act prohibits an employer (who receives federal funding) from" discriminating "against an employee 'solely by reason of'" the employee's "disability." *Ellis v. Tennessee*, 603 F. App'x 355, 358 (6th Cir. 2015) (quoting 29 U.S.C. § 794(a)).  Moore claims that the Defendants discriminated against him in two ways: (1) by failing to accommodate his disability and (2) by taking adverse employment actions against him due to his disability.  Both claims will be addressed in turn.

#### 1.    Defendants are entitled to summary judgment on Moore's failure-to-accommodate claim.

"There are two ways that a [plaintiff] can prove discrimination—directly or indirectly—each with its own test." *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) (citing *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016)).  Because "the framework for analyzing the two kinds of cases differs," it is imperative that the Court "[d]istinguish[ ] between cases that involve direct evidence of discrimination and those in which the plaintiff is not able to introduce direct evidence." *Id.* (citing *Ferrari*, 826 F.3d at 892).  Here, that task is simple.  "[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007); *see also Hostettler*, 895 F.3d at 853.  Therefore, to prevail on his failure-

to-accommodate claim, Moore must first establish a prima facie case by showing: (1) that he is "disabled" and (2) that he is "otherwise qualified" for the position despite his disability, either without accommodation, with an alleged "essential" job requirement eliminated, or with a proposed reasonable accommodation. *Kleiber*, 485 F.3d at 869; *see also Horn v. Knight Facilities Mgmt.-GM, Inc.*, 556 F. App'x 452, 455 (6th Cir. 2014). If Moore establishes that he is "disabled" and that he is "otherwise qualified," the burden then shifts to the Defendants to prove that "a challenged job criterion is essential, and therefore a business necessity," or that the proposed accommodation would "impose an undue hardship on its business." *Id.*

Here, it is undisputed that Moore is "disabled." Instead, the parties' primary point of contention is whether Moore was "otherwise qualified" for the position in question. But, before the Court can determine whether Moore was "otherwise qualified" for the position, a threshold question must be resolved: What position?

### a. The "position in question" is deputy jailer.

Moore claims that he sought only the position of control-room operator and argues that "job title is not synonymous with job 'position' under the ADA." (Doc. # 38 at 17-18). Defendants, on the other hand, contend that the control-room-operator position "was a rotating one, with no permanent person being assigned to it" and claim that Moore's position was "deputy jailer," not "control-room operator." (Doc. # 39 at 3).

The record evidence supports Defendants' argument that Moore's official position was "deputy jailer." Specifically, Moore's wage documents indicate that he "remained classified as—and received the salary and benefits of—a [deputy jailer] even after [he] assumed different daily responsibilities." *Lai Ming Chui v. Donahoe*, 580 F. App'x 430,

434 (6th Cir. 2014) (rejecting plaintiff's argument that her temporary assignment and light-duty responsibilities altered her official position); *see* (Docs. # 38-3; 38-13).

In addition to "formally retain[ing] the title," salary, and benefits of a "deputy jailer," Moore has failed to identify a vacant and funded permanent position covering only the control-room duties that he performed before taking FMLA leave. *Chui*, 580 F. App'x at 436. Rather, the record evidence establishes that working in the control room was merely one aspect of a deputy jailer's duties, not an official position. Although Moore claims that both he and "Pops" worked in the control room exclusively, those facts—at most—prove only that the Defendants offered him and "Pops" accommodations that lasted for some length of time.[8]

An accommodation, however, is not a position. And the Sixth Circuit has repeatedly recognized that distinction. *See id.; see also Clark v. Central Cartage Co.*, 73 F.3d 361 (6th Cir. 1995) (table); *Wardia v. Justice & Pub. Safety Cabinet Dep't of Juvenile Justice*, 509 F. App'x 527 (6th Cir. 2013). Where the "evidence indicate[d] that the [defendant-employer] treated [the plaintiff] as an employee on temporary assignment," rather than "as an employee in a permanent position," the Sixth Circuit found that the plaintiff-employee failed to create a genuine issue of material fact regarding whether his "job in question" was the job he was working when he was terminated, instead of the job

---

[8] The Plaintiff has also put forth testimonial evidence regarding a conversation that he allegedly overheard, where Chief Deputy Muse suggested to Jailer O'Hearn that she assign Moore to Pops's "job." (Doc. # 38-15 at 39:18-40:22). That evidence, however, does not advance Moore's argument. First, it is well-established that a court may not consider hearsay evidence when deciding a motion for summary judgment. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence … must be disregarded."). Furthermore, even if such testimonial evidence was admissible, Chief Deputy Muse's single reference to Pops's "job" in the control room does not transform the control-room duty into a control-room "position." After all, the evidence in the record suggests only that Pops was also a deputy jailer, accommodated with exclusive control-room duties while he was working, not that an official control-room position was created.

he was hired for.  *Clark*, 73 F.3d 361, at *3 n.2.  Even where a plaintiff presented proof

that he was permitted to "work in the control room without incident for over a year" and

"submitted an affidavit from a coworker" who was allegedly "offered a permanent position

in the control room" after becoming unable to perform restraints, the Sixth Circuit refused

to find that the plaintiff-employee's temporary time in the control room or the alleged job

offer created a permanent control-room-operator position.  *Wardia*, 509 F. App'x at 532.

To the contrary, the Sixth Circuit held that neither temporary, light-duty accommodations

nor "isolated, unaccepted job offer[s]" created "a new position or change[d] the status of

similar positions."  *Wardia*, 509 F. App'x at 532.[9]

The same is true here.  Moore has not presented any evidence indicating that

control-room operator was a vacant, funded position at the Detention Center.  And

Moore's mere *ipse dixit* that there was a distinct "control-room-operator position" does not

make it so.  Even drawing all inferences in Moore's favor, the evidence demonstrates only

that temporary, light-duty accommodations were made for "Pops" and Moore.  According

to the Sixth Circuit, that—without more—is insufficient to find that a new control-room-

---

[9]       The Court recognizes that courts outside of the Sixth Circuit—as well as district courts within this Circuit—have adopted an approach to defining the "position in question" that would be more favorable to Moore.  Those decisions, however, are either distinguishable, not binding on this Court, and/or were decided prior to *Chui* and *Wardia*, and thus did not have the opportunity to follow the Sixth Circuit's guidance in those cases.  *See, e.g.*, *Karnes v. Runyon*, 912 F. Supp. 280, 282 (S.D. Ohio 1995) (holding that "the position [the plaintiff] held at the time of the alleged discrimination," rather than her original position, was "more appropriate" for determining "whether she [could] perform the essential functions of the job in question"); *Nighswander v. Henderson*, 172 F. Supp. 2d 951, 961 (N.D. Ohio 2001) (defining the "position in question" as the plaintiff's modified position because the plaintiff's "modified carrier position" had "lasted for nearly four years" and thus, "was not temporary."); *Woodman v. Runyon*, 132 F.3d 1330 (10th Cir. 1997); *Florence v. Runyon*, 990 F. Supp. 485 (N.D. Tex. 1997).  Other courts' approaches are more aligned with the Sixth Circuit's and this Court's.  *See, e.g.*, *Hill v. Harper*, 6 F. Supp. 2d 540, 543 (E.D. Va. 1998) (refusing to find that plaintiff's light-duty control-room position was the "position in question" because that position was only temporary and constituted only a portion of the responsibilities of the deputy-jailer position); *Gera v. Cty. of Schuylkill*, No. 3:12-cv-1227, 2014 WL 6633094 (M.D. Pa. Nov. 21, 2014) (holding corrections-officer position, rather than control-room duty was the "position in question"); *see also Malabarba v. Chicago Tribune Co.*, 149 F.3d 690 (7th Cir. 1998); *McCollough v. Atlanta Beverage Co.*, 929 F. Supp. 1489 (N.D. Ga. 1996); *Champ v. Baltimore Cty.*, 884 F. Supp. 991 (D. Md. 1995).

operator position was created. Therefore, for the purposes of this case, the proper inquiry is whether Moore was "otherwise qualified" for the deputy-jailer position.

Having resolved the threshold "position" issue, the Court must next determine whether Moore is "otherwise qualified" for his deputy-jailer position. Moore is "otherwise qualified" if he can "perform" all of the "essential functions" of the deputy-jailer position, either with or without a reasonable accommodation. 42 U.S.C. § 12111(8); *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997). The question presented, then, is whether rotating among the various positions and safely supervising inmates—or, stated another way, whether a deputy jailer's responsibilities outside of the control room—constitute "essential functions" of the deputy-jailer position at the Detention Center.

> **b.    The "essential functions" of the deputy-jailer position include rotating among the various positions and supervising inmates.**

"The term 'essential functions' means the fundamental job duties of the employment position the individual with a disability holds or desires," rather than the "marginal functions of the position." *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(1)). Because Moore contends that all of the functions outside of the control room are unessential for the deputy-jailer position, "the burden [is] on the Defendants to demonstrate that" rotating among the various positions—booking, floor, control room—and supervising inmates are "in fact [ ] fundamental job dut[ies]." *Id.*

To "guide the essential-function inquiry," the ADA and "the regulations speak in factors—seven of them." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 762 (6th Cir. 2015) (en banc). The ADA highlights two factors: "the employer's judgment" and any "written

[job] descriptions." 42 U.S.C. § 12111(8). In addition to reiterating the two statutory factors, federal regulations provide five additional factors for courts to consider when determining whether a function is essential. 29 C.F.R. §§ 1630.2(n)(3). Four are relevant here: the amount of time spent on the job performing the function, the consequences of not requiring the individual to perform the function, the work experience of past incumbents in the job, and the current work experience of incumbents in similar jobs. 29 C.F.R. §§ 1630.2(n)(3)(iii), (iv), (vi), (viii).[10]

The "'determination of whether physical qualifications are essential functions of a job requires the court to engage in a highly fact-specific inquiry' and must 'reflect the actual functioning and circumstances of the particular enterprise involved.'" *Bush v. Compass Group USA, Inc.*, 683 F. App'x 440, 446 (6th Cir. 2017) (quoting *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988)). Thus, "the question of whether a job function is essential 'is a question of fact that is typically not suitable for resolution on a motion for summary judgment.'" *Id.* (quoting *Keith v. Cty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013)). Accordingly, the Court will not grant summary judgment if the "evidence on the issue is 'mixed.'" *Id.* (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014)).

Here, however, the evidence regarding the essential functions of a deputy jailer is not "mixed" and this is the rare case in which a jury need not resolve the question of whether a job function is essential. Indeed, it would seem to be a matter of common sense that the custody and security functions—which are accomplished by rotating

---

[10]     The fifth factor—the terms of a collective bargaining agreement—is not relevant here because there is no indication in the record that the Detention Center has such an agreement with its deputy jailers. 29 C.F.R. § 1630.2(n)(3)(v).

among the various positions and supervising inmates—are the entire reason the deputy-jailer position exists at the Detention Center.[11] 29 C.F.R. § 1630.2(n)(2)(i) ("A job function may be considered essential … because the reason the position exists is to perform that function."). Moreover, each of the relevant factors suggest that supervising inmates and rotating among the various positions are essential functions of the deputy-jailer position, the removal of which would "fundamentally alter" the deputy-jailer position. *Henschel v. Clare Cty. Road Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013).

First, the Defendants' judgment that rotating among the positions and supervising inmates is an essential function must be credited. Jailer O'Hearn testified in her deposition that all deputy jailers were required to rotate among the various positions—working as a floor deputy, booking inmates, and operating the control room—on each shift. (Doc. # 38-17 at 31:14-32:3, 51:2-23, 54:25-55:19, 59:10-20, 60:12-20). Although not "conclusive," the Defendants' judgment suggests that rotating among the various positions and supervising inmates is essential to the deputy-jailer position.

As for the second factor, neither party has submitted or relied on a written job description of the deputy-jailer position.[12] The only document in the record which purports to describe the deputy-jailer position is the "Fit for Duty" form—which explains that deputy

---

[11]     Other courts agree. *See Gera v. Cty. of Schuylkill*, No. 3:12-cv-1227, 2014 WL 6633094, at *4 (M.D. Pa. Nov. 21, 2014) ("The fundamental nature of the 'custody and control' duty to work as a corrections officer has been recognized by federal courts outside the Third Circuit and this Court must agree with their assessment."); *see also Hoskins*, 227 F.3d at 727; *Miller v. Ill. Dep't of Corr.*, 107 F.3d 483 (7th Cir. 1997); *Pickering v. City of Atlanta*, 75 F. Supp. 2d 1374 (N.D. Ga. 1999).

[12]     Although Moore's briefing takes issue with the Detention Center's employment application and its requirement that prospective employees be in "good health," that document is dated March of 2016—after Moore was terminated—and it is unclear from the record whether the document existed before that date, and if so, what sort of job description it provided. (Doc. # 38-18 at 24:17-31:11). The ADA and regulations specify that a written job description "shall be considered evidence of the essential functions of the job" only if it was "prepared … before advertising or interviewing applicants for the job." 42 U.S.C. § 12111(8). Therefore, the March 2016 application is of little value on this record.

jailers "are charged with maintaining the safety and security of inmates" and lists a multitude of required physical fitness standards—seems to indicate that a variety of physically demanding functions related to inmate supervision are essential to the deputy-jailer position. (Doc. # 38-2).

The third factor—the amount of time spent on the job performing the function—also suggests that rotating among the positions and supervising inmates is essential to the deputy-jailer position. According to the deposition testimony of Chief Deputy Muse, a deputy jailer's time in the control room was typically limited to four hours of his twelve-hour shift. (Doc. # 38-16 at 27:17-29:16, 32:14-33:1). Therefore, a deputy jailer's time spent rotating in positions other than control-room operator and supervising inmates accounts for approximately two-thirds of his twelve-hour workday. Given that the majority of a deputy jailer's time is devoted to responsibilities outside the control room, the third factor indicates that rotating among the positions and supervising inmates are essential functions.

Fourth, the "consequences of not requiring the incumbent" to rotate among the various positions or requiring that the incumbent be able to safely supervise inmates give rise to serious consequences. Aside from having to shift those responsibilities to other deputy jailers, permitting a deputy jailer who is unable to safely supervise inmates to work in the Detention Center presents a serious threat to security and safety, for deputy jailers and inmates alike. *See Wardia*, 509 F. App'x at 530 (holding that "inability to properly restrain juveniles could have serious consequences for the safety of staff and juveniles at the facility"); *Hoskins*, 227 F.3d at 727 (holding that inability to restrain prisoners "could be a serious threat to security"). Therefore, the fourth factor weighs heavily in favor of

finding that rotating among positions and supervising inmates is essential to the deputy-jailer position.

The fifth and sixth factors—the work experience of past incumbents in the job, and the current work experience of incumbents in similar jobs—also suggest that rotating among the positions and supervising inmates are essential functions. Both Jailer O'Hearn and Chief Deputy Muse testified that rotating among the positions and being able to safely supervise and interact with inmates were essential to the deputy-jailer position. (Docs. # 38-16 at 28:18-29:8, 74:21-76:16; 38-17 at 51:2-12, 54:25-55:19). Although during his deposition testimony, Moore was unwilling to admit that his physical condition could render him unable to defend himself against an inmate, he did concede that it was possible that a physical confrontation could occur and that an inmate may be able to take away his cane and hurt Moore, another deputy jailer, or another inmate. (Doc. # 38-15 at 66:3-68:8).

Because each of the relevant factors supports the conclusion that rotating among the positions and supervising inmates are "fundamental job duties," the Defendants have met their burden of demonstrating that those functions are "essential functions." *Hoskins*, 227 F.3d at 726. In response to this showing, Moore relies on two pieces of evidence to argue that his essential functions were limited to control-room responsibilities.[13] (Doc. # 38 at 18-21). Even when considered together, however, Moore's evidence amounts to a

---

[13]     To be sure, Moore also cites his own deposition testimony as evidence that his "essential functions" were limited to the control room. (Doc. # 38 at 18-19). "In any event, [Moore's] testimony does not add much" because "[n]either the [ADA] nor regulations nor EEOC guidance instructs courts to credit the employee's opinion about what functions are essential." *Ford Motor Co.*, 782 F.3d at 764. As for the evidence that the statute and regulations do instruct courts to consider, all of it points towards the conclusion that rotating among the positions and supervising inmates are "essential functions" of the deputy-jailer position.

mere "scintilla of evidence" and is insufficient to create a genuine dispute of material fact on this issue. *Anderson*, 477 U.S. at 252.

First, Moore points to a July 15, 2015 doctor's note seeking to excuse a ten-day absence from work, spanning from July 13 through July 23, 2015. (Doc. # 38-11). At the bottom of that doctor's note, Jailer O'Hearn summarized a conversation with Moore on July 17, 2015, which alludes to Moore working exclusively in the control room. *Id.* Moore claims that Jailer O'Hearn's notation proves that the "essential functions" of Moore's deputy-jailer position related only to the control room. (Doc. # 38 at 19-20). Jailer O'Hearn's jotted note, however, is incapable of bearing the amount of evidentiary weight Moore attempts to assign it. Accepting all of Moore's evidence as true and drawing all reasonable inferences in his favor, Jailer O'Hearn's note supports Moore's claim that he worked exclusively in the control room prior to taking FMLA leave,[14] but it does not establish that the "essential functions" of the deputy-jailer position were confined to the control room.

Second, Moore points to an FMLA form, which indicates his job title was "deputy jailer" but identifies only one essential job function: "control room." (Doc. # 38-13). Moore claims that the FMLA form confirms that his sole "essential function" related to his control-room duties.[15] (Doc. # 38 at 21). Although perhaps more germane than the other evidence, the FMLA form does not provide proof that a deputy jailer's "essential functions" are limited to the control room. As an initial matter, it is unclear from the record who filled

---

[14] The doctor's note and Jailer O'Hearn's conversation summary also indicate that at some point, Moore became physically unable to perform even the light-duty control-room assignment.

[15] Moore also asserts that filling out the FMLA form in that way "constituted a promise" to restore him to the "control-room-operator position" when he returned from FMLA leave. (Doc. # 38 at 21). But, that argument is beside the point here, where Moore failed to bring a cause of action under the FMLA and disclaims any attempt to "seek[ ] damages under the FMLA." *Id.*

out the FMLA form or who provided the information detailing Moore's "essential functions."[16]  Moreover, even if the FMLA form is considered, it does not impact the "essential functions" analysis or support a conclusion that operating the control room is the sole "essential function" of a deputy jailer.  In fact, the control-room responsibilities that Moore seeks to establish as the "fundamental job duties" of his position, are—at most—"marginal functions" of the deputy-jailer position.  29 C.F.R. § 1630.2(n)(1).  Given that all six factors point toward the same conclusion—that rotating among the various positions and supervising inmates are essential functions of the deputy-jailer position— no reasonable jury could find otherwise.

### c.      Moore did not request a "reasonable accommodation."

Because Moore has not raised a genuine issue of material fact as to the essentiality of rotating among the various positions and supervising inmates, whether he is "otherwise qualified" for the position of deputy jailer "depends on whether he proposed a reasonable accommodation to account for his disability."  *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010).

"If a disabled employee requires an accommodation, the employee is saddled with the burden of proposing an accommodation and proving that it is reasonable."  *Id.* (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996) *abrogated in part by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012)).  "Furthermore, the plaintiff has the burden of proving that he will be 'capable of performing the essential

---

[16]      From a review of the record, it appears as though Kristy Arrasmith, an individual employed by the Mason County Fiscal Court, completed Moore's FMLA paperwork.  That assumption, however, is premised on the fact that Kristy Arrasmith's name appears on the "Notice of Eligibility and Rights & Responsibilities" Form (Doc. # 38-14).  Her name does not appear anywhere on the "Certification of Health Care Provider for Employee's Serious Health Condition," which is the FMLA form that lists "control room" as Moore's "essential job functions."  (Doc. # 38-13).

functions of the job with the proposed accommodation.'" *Id.* (quoting *Monette*, 90 F.3d at 1184). "If the plaintiff establishes that a reasonable accommodation is possible, the employer bears the burden of proving that such reasonable accommodation would impose an undue hardship." *Hoskins*, 227 F.3d at 728 (citing *Monette*, 90 F.3d at 1186 n.12).

"A reasonable accommodation is one that is objectively reasonable 'in the sense [that it is] both of efficacious'" and "'proportional to costs.'" *Henschel*, 737 F.3d at 1024-25 (quoting *Keith*, 703 F.3d at 927). "The reasonableness of a requested accommodation is generally a question of fact." *Id.* at 1025. Among other things, a "[r]easonable accommodation may include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.'" *Hoskins*, 227 F.3d at 728 (quoting 42 U.S.C. § 12111(9)(B)).

Moore has proposed two, interdependent accommodations, which he claims are "reasonable." First, Moore implies that the Defendants could have accommodated him by reassigning him to the control room, exclusively. (Doc. # 38 at 22-23). But, that's not all. Even if Defendants were to grant Moore that accommodation, he also needs another: permission to ambulate throughout the Detention Center with an assistive device—either a cane or a wheelchair. *Id.* at 23. Because caselaw conclusively establishes that the initial accommodation Moore seeks—a permanent control-room position—is objectively unreasonable, the Court need not address whether permitting Moore to ambulate

throughout the Detention Center with an assistive device would be a further, reasonable accommodation.

"In failure-to-accommodate claims where the employee requests an 'accommodation that exempts [him] from an essential function,' 'the essential functions and reasonable accommodation analyses … run together." *Ford Motor Co.*, 782 F.3d at 763 (citing *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1240 (9th Cir. 2012)). Put another way, "[o]ne conclusion"—that the function is essential—"leads to the other"—the requested accommodation is unreasonable. *Id.* That is the case here.

Moore seeks an accommodation that eliminates the bulk—if not all—of the essential functions of his deputy-jailer position; specifically, rotating among the various positions and supervising inmates.[17] Requiring the Defendants to provide such an accommodation would turn the ADA, the Rehabilitation Act, and the KCRA on their heads. Federal law seeks to defy stereotypes and prevent discrimination against disabled persons who can perform the essential functions of the position they hold or desire, with a reasonable accommodation. With that purpose in mind, federal law "requires employers to reasonably accommodate their disabled employees." *Ford Motor Co.*, 782 F.3d at 757. It does not, however, "endow all disabled persons with a job … of their choosing." *Id.*

---

[17] That distinguishes this case from cases where courts have found that summary judgment is inappropriate. Take *Rorrer*, 743 F.3d 1025, for example. In that case, the plaintiff-firefighter was in an accident that left him with monocular vision. As a result, the City of Stow and the City Fire Chief determined that Rorrer was unable to perform the "essential functions" of a firefighter because he was unable to drive a firetruck during an emergency. "Drawing all reasonable inferences in favor of Rorrer," the Sixth Circuit held that "the suggested accommodation that he not drive an apparatus during an emergency was reasonable because it would have excused him from performing a marginal function that could have 'easily' been performed by his colleagues." *Id.* at 1044. Here, however, Moore seeks the inverse: to continue working as a deputy jailer with the duties of that position confined to one—arguably marginal—function: operating the control room. Federal law does not support such a request.

The importance of that distinction is highlighted here, where Moore seeks to work as a deputy jailer, a position that is inherently dangerous.

Put simply, Moore's requested accommodation is "unreasonable" for a multitude of reasons. First, "a proposed accommodation requesting that an employer remove an 'essential function' from the position is *per se* unreasonable." *Bush*, 683 F. App'x at 449 (citing *Ford Motor Co.*, 782 F.3d at 761). Nor does federal law "require employers to create a new position for a disabled employee who can no longer perform the essential functions of his job." *Smith*, 129 F.3d at 867. "Similarly, the ADA does not require an employer to reassign an employee to a position that is not vacant." *Id.* (internal citations omitted).[18] As a result, courts—including the Sixth Circuit—have uniformly rejected deputy jailers' requests that their employers convert a rotating control-room position into a permanent position, concluding that such proposals are not "reasonable accommodations" because they "would essentially require the creation of a new position rather than reassignment to an otherwise existing vacant one." *Hoskins*, 227 F.3d at 730; *see also Wardia*, 509 F. App'x 531-32; *Hill v. Harper*, 6 F. Supp. 2d 540, 543 (E.D. Va. 1998); *Gera v. Cty. of Schuylkill*, No. 3:12-cv-1227, 2014 WL 6633094 (M.D. Pa. Nov. 21, 2014); *Kees v. Wallenstein*, 161 F.3d 1196 (9th Cir. 1998); *Spears v. Creel*, 607 F. App'x 943 (11th Cir. 2015). Therefore, Moore's requested accommodation for permanent assignment to the control room is not a reasonable accommodation.

---

[18] For these same reasons, Moore's "position in question" argument misses the mark. If employers are not required to convert temporary light-duty positions into permanent positions to accommodate their disabled employees, it makes little sense that placing an employee in a temporary light-duty position would create a permanent position with those light-duty parameters. In fact, if providing a temporary light-duty accommodation automatically created a new light-duty permanent position, there would be no need to "accommodate" such employees. Therefore, Moore's "position in question" argument is merely an attempt to effect an end-run around clear Sixth Circuit precedent that temporary light-duty positions need not be converted into permanent positions. *Wardia*, 509 F. App'x at 532.

Moore's reliance on Defendants' alleged "provision of the same accommodation that he requested to [another] disabled employee"—"Pops"—"as evidence that he was denied reasonable accommodation is misplaced." *Smith*, 129 F.3d at 867. "An employer who provides an accommodation that is not required by the ADA to one employee is not consequentially obligated to provide the same accommodation to other disabled employees." *Id.* (citing *Traynor v. Turnage*, 485 U.S. 535, 549 (1988)). In fact, "if the ADA required employers to offer all disabled employees an accommodation that it provided to some employees as a matter of good faith, then a good deed would effectively ratchet up liability." *Id.* at 868. Such a rule, the Sixth Circuit has reasoned, "would deter employers from providing greater accommodations than are required by law." *Id.* And in turn, "would actually frustrate the purposes of the ADA: if employers are locked in to extending temporary positions for injured workers on a permanent basis (whether initially granted consistent with company policy or as a well-intentioned special arrangement), they might well be less inclined to permit such an arrangement in the first place." *Wardia*, 509 F. App'x at 532. Therefore, even assuming that "Pops" received a permanent light-duty position in the control room, the Defendants' "provision of a certain accommodation to one disabled employee does not automatically entitle plaintiff to the same accommodation." *Smith*, 129 F.3d at 868.

Because Moore "failed to propose an objectively reasonable accommodation for his disability," and because he is unable to perform the essential functions of the deputy-jailer position, "he has failed to create a genuine issue regarding whether he was an otherwise qualified individual with a disability."[19] *Id.* Accordingly, the Defendants are

---

[19] Moore "also argues that whatever the reasonableness of the proposed accommodations," the Defendants "violated the ADA" and thus, the Rehabilitation Act "by failing to engage in good faith in an

entitled to judgment as a matter of law on Moore's failure-to-accommodate claim under the Rehabilitation Act and the KCRA, and their Motion for Summary Judgment (Doc. # 32) is **granted**.

> **d.    In any event, Moore was also not "qualified" to be a "control-room operator."**

Even assuming *arguendo* that the relevant "position in question" was determined to be "control-room operator" or that the "essential functions" of Moore's job were limited to operating the control room, it is far from clear that he would be "qualified" for such a position.   In fact, in Moore's Response to Defendants' Motion for Summary Judgment, where he advances those arguments, he also acknowledges that he is unable to ambulate without assistance.  (Doc. # 38 at 23).   Nonetheless, Moore contends that an "accommodation … could easily have been made by allowing him the use of a cane" or a wheelchair, claiming that the record "establishe[s] that the jail has at least one wheelchair available for use."  (Doc. # 38 at 23).

To begin, the record does *not* establish that the Detention Center has a wheelchair available for employee use.   Jailer O'Hearn's deposition testimony, which Moore cites for that proposition, establishes only that wheelchairs are available for inmate purposes:

> Q:     I'm just asking if you know if there was anyone who did, in fact, use a cane or crutches or anything like that, even if you didn't approve of it?
> A:     No.
> Q:     What about a wheelchair?

---

informal, interactive process," as Sixth Circuit caselaw requires.  *Wardia*, 509 F. App'x at 532 n.1; *see* (Doc. # 38 at 13-14).   Sixth Circuit caselaw, however, is clear: "Even if [Defendants] did not put sufficient effort into the 'interactive process ' of finding an accommodation … 'that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual.'"  *Ford Motor Co.*, 782 F.3d at 766 (citing 29 C.F.R. § 1630.2(o)(3); quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013)). "Courts thus need not consider this form of non-independent liability 'if the employee fails to present evidence sufficient to reach the jury on the question of whether [he] was able to perform the essential functions of [his] job with an accommodation.'"  *Id.* (quoting *Basden*, 714 F.3d at 1039."  Therefore, it "suffices here to hold that any failure by [Defendants] does not create liability because, as [the Court] just concluded," Moore "did not produce such evidence."  *Id.*

A:    I don't know if we had the use of a wheelchair or not.  I don't know if there were – I don't remember seeing it.  I don't know.  I don't know.  Could be an intoxicated person.  I don't know.

Q:    But you don't remember –

A:    We have a wheelchair in the sally port.

Q:    Okay.  What is it used for?

A:    I guess if they have to take an inmate to or from in a wheelchair.  I don't know.

Q:    Do you ever remember seeing it used?

A:    I can't say that I remember seeing it used, but I know we have one in the sally port.

Q:    Okay.  So crutches not allowed in the jail?

A:    No.

Q:    Cane not allowed in the jail?

A:    No.

Q:    Wheelchair not allowed in the jail?

A:    If you needed to get an inmate out if they are hurt or something, I would assume so.  That's what it's there for.

(Doc. # 38-17 at 49:16-50:17).

Although a "person is 'otherwise qualified' if he or she can perform the essential functions of the job in question,'" that standard is satisfied only if the individual can do so without posing "a 'direct threat' to the health or safety of others."  *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 11 (6th Cir. 2012) (citing 42 U.S.C. § 12111(3)).  Therefore, "a disabled individual … is not 'qualified' for a specific employment position if he or she poses a 'direct threat' to the health or safety of others which cannot be eliminated by a reasonable accommodation."  *Id.*  Four factors guide the direct-threat analysis: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm.  29 C.F.R. § 1620.2(r).

In this case—where Moore's physical infirmities would likely render him unable to defend himself, other deputies, or inmates from a violent inmate—those four factors suggest that Moore would pose a "direct threat" to the health or safety of himself or others,

a reality which Moore himself conceded in his deposition. (Doc. # 38-15 at 65:17-68:8). Not to mention, Moore's proposed accommodation that he be permitted to use a cane— an assistive device in Moore's hands, but a possible weapon in a violent inmate's hands— likely increases the safety risks for Moore, fellow deputy jailers, and inmates.

By Moore's own account of his physical condition, he believed he was unable to "bend over," "lift persons/inmates," "run," "walk swiftly," "physically disrupt fights," "go hands on with others," "physically restrain inmates," or "engage in forced movements of inmates." (Doc. # 38-2). Although Moore was adamant during his deposition testimony that he could defend himself, his own statements about his physical condition suggest that he would pose a "direct threat" to the health or safety of himself or others if working at the Detention Center and interacting with inmates:

> Q: Okay. Okay. Did [Jailer O'Hearn] ever elaborate on what the restrictions on this form would prevent you from doing and how it would impact your job as a deputy jailer – or sergeant?
> A: The reason why that I understood is why she wouldn't give me my job back is because I needed a cane to go from the control room to the front office.
> Q: Okay. And did you and she talk about that?
> A: She said it wasn't going to be a cane.
> Q: Okay. And did she tell you why?
> A: Afraid an inmate would take it away from me and beat me with it, I guess, is the way she put it.
> Q: Do you feel like that was a fair summary of what could happen if you were on a cane?
> A: Well, if the jail is run right, now, it wouldn't happen.
> Q: Well, in a perfect setting, I assume all the inmates are in their cells?
> A: Uh-huh.
> Q: But there are times when inmates come out of their cells, be the trustees or whatever?
> A: Yes, sir.
> Q: So do you think it would be a fair assumption, if there was a confrontation between you and an inmate, that what she was fearful of could, in fact, happen?
> A: Yes.

Q:  Okay.  Do you believe you could defend yourself while on a cane against some of these desperadoes?
A:  No doubt in my mind.
Q:  That you could?
A:  Yes, sir.
Q:  Okay.  How are you going to do that?  Explain that to me.  You guys have got some bad dudes in there, I mean?
A:  Yeah, I've dealt with a lot of bad dudes and a lot of easy dudes.
Q:  But not on a cane?
A:  But you know what, a lot of them has got respect for me.
Q:  Well, I don't doubt that.  I'm not suggesting that this is going to be a thing that would happen every day, you know, but inmates do get violent.
A:  Oh, yes, I agree.
Q:  And I'm just trying to determine, if you were accosted by a large inmate who was in a violent mood, do you feel like you could have defended yourself while on a cane?
A:  I'll put it this way, I wouldn't quit.
Q:  I'm not asking you that.  You strike me as somebody that wouldn't quit.
A:  Yes.  Yes, I do feel like I could defend myself.

(Doc. # 38-15 at 65:24-68:8).

Ultimately, whether Moore could defend himself—or intervene on behalf of another deputy jailer or inmate—if a confrontation with a violent inmate arose is "unknowable—unless the employer runs the very risk that the law seeks to prevent."  *Michael v. City of Troy Police Dep't*, 808 F3d 304 (6th Cir. 2015).  Based on Moore's own description of his physical condition on the "Fit for Duty" form (Doc. # 38-2), however, it is doubtful.  Neither the ADA, the Rehabilitation Act, nor the KCRA require the Defendants to wait to know for certain.  Instead, the ADA provides that a disabled individual is "not 'qualified' for a specific employment position if he or she poses a 'direct threat' to the health or safety of others which cannot be eliminated by a reasonable accommodation."[20]  *Estate of Mauro ex rel. Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 402 (6th Cir. 1998).

---

[20]  "The ADA mandates an individualized inquiry in determining whether" an individual's "disability or condition disqualifies him from a particular position."  *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000).  Thus, a "proper evaluation involves a consideration of the applicant's personal

## 2. Defendants are entitled to summary judgment on Moore's disability-discrimination claim.

In addition to his failure-to-accommodate claim, Moore also claims that Defendants discriminated against him by taking adverse employment actions against him. To recover on a disability-discrimination claim under the Rehabilitation Act, Moore must show that: (1) he is an individual with a disability; (2) that he is "otherwise qualified" for the position in question, with or without reasonable accommodation; and (3) he suffered an adverse employment action solely by reason of his disability. *Lee*, 636 F.3d at 249.

Moore points to two adverse employment actions that the Defendants allegedly took against him: (1) requiring him to complete the "Fit for Duty" form and (2) terminating him. A lengthy analysis of Moore's claim or the alleged adverse employment actions, however is unnecessary.[21]  Moore's disability-discrimination claim "fails for the same reason [his] failure-to-accommodate claim fails": he is not a qualified individual with a

characteristics, his actual medical condition, and effect, if any, the condition may have on his ability to perform the job in question." *Keith*, 703 F.3d at 923. Here, Moore has pointed to no evidence that the Defendants' conclusions regarding safety were "based on stereotypes and generalizations about a disability;" *id.*, instead, Defendants relied on Moore's own description of his physical condition, as well as the opinion of Moore's personal physician. (Docs. # 38-2; 38-15 at 63:15-65:8).

[21]  That said, one thing is worth noting. Moore makes much of the "Fit for Duty" form—he complains that the form was never given to any other Detention Center employees, claims that the form was created specifically to prevent him from returning to work, and criticizes the form's failure to include certain physical abilities that are necessary for performing duties in the control room. (Doc. # 38 at 3, 14-17).

The Rehabilitation Act, through incorporation of the ADA, prohibits an employer from "requir[ing] a medical examination" or making "inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). But, the following subsection of that statute, titled "Acceptable examinations and inquiries," specifically permits employers to "make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B). In fact, in response to the question: "May an employer ask disability-related questions or require a medical examination when an employee who has been on leave for a medical condition wants to return to work?" the EEOC answered: "Yes, if an employer has a reasonable belief that an employee's present ability to perform essential functions will be impaired by a medical condition or that he or she will pose a direct threat because of a medical condition." EEOC, *Enforcement Guidance: Question & Answers: Enforcement Guidance on Disability-Related Inquiries & Medical Examinations of Employees under the ADA*, 2000 WL 33407183 (July 26, 2000). That is what the Defendants did, and the ADA explicitly permits it.

disability because he could not perform the essential function of his deputy-jailer position, with or without a reasonable accommodation. *Chui*, 580 F. App'x at 437. Therefore, the Defendants are entitled to judgment as a matter of law on Moore's disability-discrimination claim under the Rehabilitation Act and the KCRA, and their Motion for Summary Judgment (Doc. # 32) is **granted**.

## III.   CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     Defendants Mason County and Mason County Detention Center's Motion for Summary Judgment (Doc. # 32) is **granted in full**;

(2)     Plaintiff Robert L. Moore's Complaint (Doc. # 1) is **dismissed with prejudice**;

(3)     This case is **dismissed** and **stricken** from the Court's active docket; and

(4)     A Judgment shall be filed contemporaneously herewith.

This 4th day of September, 2018.



Signed By:
*David L. Bunning*   *DB*
United States District Judge

K:\DATA\Opinions\Covington\2016\16-185 Moore v Mason Cty MSJ MOO.docx